IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 19-33347** |
| **VERT SOLAR FINANCE, LLC,** | § | |
| | § | **Chapter 7** |
| | § | |
| Debtor. | § | **Judge Jeffrey P. Norman** |

---

| | | |
|---|---|---|
| **EVA S. ENGELHART, CHAPTER 7 TRUSTEE** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **Adversary No. 21-03442** |
| | § | |
| | § | |
| **JOAQUIN ALTENBERG,** | § | |
| **VERT INVESTMENT GROUP, LLC,** | § | |
| **CLEAN ENERGY NEXUS, LLC,** | § | |
| **and ALISON ALTENBERG,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**TRUSTEE'S AMENDED ORIGINAL COMPLAINT**</u>

**TO THE HONORABLE JEFFREY P. NORMAN, UNITED STATES BANKRUPTCY JUDGE:**

Eva S. Engelhart, in her capacity as Chapter 7 Trustee of the bankruptcy estate of VERT Solar Finance, LLC (the "<u>Debtor</u>" or the "<u>Company</u>"), by and through her undersigned special counsel Fox Rothschild LLP ("<u>Special Counsel</u>"), hereby files this Amended Complaint (the "<u>Complaint</u>") against: (1) Joaquin Altenberg ("<u>Altenberg</u>"); (2) VERT Investment Group, LLC ("<u>VIG</u>"); (3) Clean Energy Nexus, LLC ("<u>CEN</u>"); and (4) Alison Altenberg ("<u>Alison</u>") (collectively, the "<u>Defendants</u>") based upon the review of documents, public filings, sworn

testimony, including the sworn testimony of Defendants Altenberg and Alison, the investigation conducted by Special Counsel, and upon information and belief as to all other averments, and in support thereof respectfully states the following:

## I.

## <u>NATURE OF THE ACTION</u>

1.      This adversary proceeding is brought by the Plaintiff against the Defendants to recover actual and constructive fraudulent transfers made by the Defendants, for breach of fiduciary duties to the Debtor, and for damages resulting therefrom.  This action concerns the fraudulent transfer of the Debtor's assets, including its business interests and opportunities, by Altenberg and entities formed, owned and controlled by him (CEN and VIG).

## II.

## <u>JURISDICTION AND VENUE</u>

2.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a).  This action is a core-proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested herein are sections 544, 548, and 550 of Chapter 11, Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and the Uniform Fraudulent Transfer Act of the Texas Business and Commerce Code (the "<u>Texas Fraudulent Transfer Act</u>") (TEX. BUS. COMM. CODE § 24.001 *et seq.*).

5.      The Trustee has commenced this adversary proceeding in accordance with Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

6.      The Trustee confirms its consent to the entry of a final order or judgment by this Court in connection with this Complaint to the extent that it is later determined that the Court,

2

absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

### III.

### PARTIES

7.      Plaintiff, Eva S. Engelhart ("Plaintiff" or "Trustee"), is the duly-appointed Chapter 7 Trustee for the bankruptcy estate of the Debtor.  Plaintiff may be served with pleadings and process in this adversary proceeding through her undersigned Special Counsel.

8.      Defendant, Joaquin Altenberg ("Altenberg"), the founder, Chief Executive Officer and Managing Member of the Debtor, the founder and former Chief Executive Officer of CEN, and the founder and managing member of VIG, resides at 3718 Sunset Boulevard, Houston, Texas 77005 and claims to also reside in a rented apartment in San Juan, Puerto Rico, although Altenberg has a driver's license issued by the State of Texas only.  Altenberg can be served through his Houston, Texas counsel Miles Cohn and Michelle V. Friery, Crain, Caton & James, Five Houston Center, 1401 McKinney St., Suite 1700, Houston, Texas 77010.

9.      Defendant, VERT Investment Group, LLC ("VIG") is a limited liability company formed by Altenberg under the laws of the State of Texas in 2008.  VIG's last known address is 12 Greenway Plaza, Suite 1100, Houston, Texas 77046.  VIG is owned and controlled entirely by Altenberg.  VIG's charter was forfeited by the State of Texas on April 20, 2018 and has not been reinstated.

10.      Defendant, Clean Energy Nexus, LLC ("CEN") is a limited liability company formed by Altenberg under the laws of the State of Delaware on September 6, 2018 with a registered agent located at LegalInc Corporate Services Inc., 651 N. Broad Street, Suite 206, Middletown, Delaware 19709.

11.     Defendant, Alison Altenberg ("Alison"), is an adult individual who resides at 3718 Sunset Boulevard, Houston, Texas 77005.  Alison is the wife of Defendant Altenberg.

**IV.**

**FACTUAL BACKGROUND**

A.  The Debtor's Business

12.     Altenberg formed the Debtor (a Delaware limited liability company) on January 16, 2015, to engage in commercial and industrial solar projects. Altenberg used the title of Chief Executive Officer, and he solely managed and controlled the Debtor.[1]  Following its formation, Debtor actively engaged in the business of acquiring, developing, owning, operating, and improving commercial and industrial solar energy projects from its office in Houston, Texas.

13.     In a Project Acquisition and Finance Summary dated September 2015, Altenberg wrote that the Debtor "was created to manage the life-cycle of a renewable energy project, from late-state development, through construction, to long-term operations and exit."  During a deposition on October 3, 2018, Altenberg testified that Debtor was the only company "doing development and investment in the same space."

14.     To generate business, Debtor solicited information about potential or actual solar energy projects from developers and clients.  Debtor used this information to perform an analysis to determine whether a solar energy project was worth the Company's interest and involvement. This process was developed and refined by Altenberg while he served as Debtor's Chief Executive Officer, and the end-product of each project analysis was referred to as a Preliminary Assessment Report ("PAR").  The PARs were often prepared by Daniel Gonzales ("Gonzales"), Altenberg's

---

[1] Initially, Debtor had two members:  VIG, a Texas limited liability company formed, owned and controlled solely by Altenberg in 2008, and Surge Accelerator 4, L.P. ("Surge"), a now-defunct seed fund and mentor-driven accelerator that was located in Houston, Texas.  VIG had a 93% interest in Debtor and Surge had a 7% interest in the Company.

right-hand man.  The PARs provided Altenberg and Debtor with critical information in deciding whether to take on a project.  If the asset yield was high enough, Debtor would accept a project.

15.     Altenberg formed a fund called the VERT Solar Fund I, LLC (the "VERT Fund") in which he caused three investors (the "VERT Fund Investors") to invest over $6.8 million. Altenberg was supposed to use that money to develop and finance the Debtor's solar energy projects following specified protocols.  However, Altenberg subsequently misappropriated the VERT Fund Investor's money such that it was quickly depleted without return.

16.     In 2017, upon realization of Altenberg's malfeasance, the VERT Fund Investors sued Debtor and Altenberg for fraud and breach of fiduciary duty in the Court of Chancery of the State of Delaware.  *See HOMF II Investment Corp., et al. v. Altenberg, et al.*, Delaware Chancery Court, Case No. 2017-0293-JTL (the "Delaware Action").  The Delaware Action proceeded to trial against Altenberg in September 2019 (the Debtor's bankruptcy filing on June 14, 2019 stayed the action against VERT), and the Delaware Court held that Altenberg breached his fiduciary duty of loyalty to the VERT Fund and that Altenberg fraudulently induced the VERT Fund Investors to invest in the VERT Fund.  *Id*.  The Delaware Court entered a judgment against Altenberg for over $6 million (damages and attorneys' fees).  *Id*.  In connection with the post-trial award of attorneys' fees on December 7, 2020, the Delaware Court stated: "Altenberg's pre-litigation conduct reflected a pattern of fraud and misrepresentation that was sufficiently egregious to warrant shifting fees. During this litigation, Altenberg engaged in a pattern of serial misconduct that provides additional support for shifting attorneys' fees and expenses."[2] *Id*.

---

[2] Altenberg was caught using money from the Debtor to pay for his defense costs in the Delaware Action.  The Delaware court issued an order instructing Altenberg not to take money out of the VERT Fund to pay for his defense costs.  True to form, Altenberg ignored that instruction and shortly thereafter transferred more money out of the Debtor to pay defense costs.  Altenberg was subsequently found in contempt of court and ordered to repay the VERT Fund the money he had improperly taken from it.

125529343.6

17.     By November 2017, Debtor "faced a financial crunch" and was teetering on insolvency.  According to Altenberg, the Debtor at that time "had payables of over $200,000 and no money coming in."  Additionally, Altenberg and Debtor were defendants in two lawsuits – the Delaware Action and a separate collection action (the "Teris Action").[3]

B.  The Formation of CEN

18.     In response to Debtor's financial and legal challenges, Altenberg secretly formed CEN to usurp the Debtor's business interests and opportunities.  More specifically, CEN was created to usurp a high yielding business opportunity presented to Debtor to develop a large manufacturing solar energy project for Medtronic PLC, a global medical device manufacturer, in Juncos, Puerto Rico (the "Juncos Project").

19.     Altenberg formed CEN on September 6, 2018, just two weeks after a deposition in the Delaware action in which he testified he was contemplating bankruptcy for VERT.  At that deposition, Altenberg testified that he formed CEN because he "just felt defeated and – and like the harassment from [VERT Fund Investors and their counsel in the Delaware Action] wasn't going to end, and you were interfering with my business and not giving me any chance to succeed."

20.     To conceal his personal involvement in the formation of CEN, Altenberg used VIG as the founding and sole member of CEN even though the State of Texas had cancelled VIG's charter five months earlier.[4]  Altenberg formed CEN to get himself away from the Debtor's

---

[3] Teris, a creditor of the Debtor, sued Debtor in the County Civil Court for Harris County, Texas seeking the $61,597.44 owed it by Debtor, plus attorneys' fees and costs (Cause No. 1109763) (the "Teris Action").  On August 27, 2018 (two weeks before Altenberg secretly formed CEN), Teris filed a motion for summary judgment seeking judgment against Debtor for $67,097.44 ($61,597.44 debt, plus $5,500 in attorneys' fee and costs).  On September 24, 2018, Teris was granted a judgment against the Debtor in the Teris Action for $67,097.44.

[4] On April 20, 2018, the Texas Secretary of State cancelled the charter of VIG for its failure to pay taxes.

6

creditors and the VERT Fund Investors (members of the Debtor) once he realized the significant potential for the Juncos Project.

21.     Altenberg kept the formation of CEN very close to his vest and it remained a secret until March 2019 when, over six months after forming CEN and three months before putting the Debtor into bankruptcy, Altenberg publicly advertised the existence of CEN in connection with his solicitation for interest in another solar energy project located in Maryland called Dans Mountain.

C.     Debtor and CEN Are One in the Same

22.     As evidence that the business between Debtor and CEN did not change, during a deposition in the Delaware Action on June 20, 2019, Gonzales testified that his duties did not change between Debtor and CEN after CEN was formed:

> Q:     [W]hat is your title at Clean Energy Nexus [CEN]?
>
> A:     Business Development Officer.
>
> Q:     [W]hat are your duties as the Business Development Officer of Clean Energy Nexus?
>
> A:     So originating new projects for us to work on and helping the ones that are in our portal now to get funneled through the process to either financing or whatever they need for the project.
>
> Q:     Who was your employer immediately preceding Clean Energy Nexus?
>
> A:     VERT Solar Finance [Debtor].
>
> Q     [W]hat was your last title at VERT Solar Finance?
>
> A:     I don't know if I really had an official title, but it was probably just business development.

7

> Q:      **Have your duties changed at all between VERT Solar Finance [Debtor]**
>
> **and Clean Energy Nexus [CEN]?**
>
> A:      **No, not really.**

(emphasis added)

23.     Debtor and CEN had the same employees. Altenberg testified that he started to take CEN live in January 2019.  This included creating a website and creating CEN email accounts for himself and Gonzales.   When Altenberg shifted from Debtor to CEN, Debtor had only two employees – Altenberg and Gonzales.   Altenberg and Gonzales also became the first two employees of CEN.   When Altenberg was deposed one week after he put Debtor into bankruptcy, he testified that CEN had the same two employees, himself and Gonzales (i.e. the same employees shifted from working for Debtor to working for CEN without interruption).

24.     Further evidencing that Debtor and CEN were the same company, the initial website for CEN was the same website used by the Debtor with the only exception being the change in the company's name.  This is best exemplified by Exhibit A to this Complaint showing a comparison of the two websites.  The pictures, font and language are identical.  Altenberg simply replaced Debtor's name and logo with CEN's name and logo.

25.     Altenberg used the same marketing material for CEN as he had used for Debtor. Altenberg commonly prepared a Confidential Information Memorandum in his attempts to secure investors for Debtor and CEN.  The decks were similar and many pages of the deck are unchanged except for Debtor's and CEN's names.  The photograph on the cover of each deck were identical. The full-page Disclosure Statement in the decks were identical except Altenberg swapped Debtor's name for CEN.  Altenberg even failed to remove from the CEN deck the name of Debtor's former Chief Technology Officer (Elwyn Thompson) who had long left the Company.

26.     Notably, Altenberg left the description of CEN with what had been previously written to describe Debtor's business.  A comparison of the descriptions of the business in Debtor's Executive Summary and CEN's Executive Summary are set forth below.

Debtor's Deck dated May 2018:

> Vert Solar Finance is a complete financing solution for solar developers, EPCs, Solar Technology Providers and Project Hosts in North America.  CEN's team has developed over 1,200 MWs of renewable energy projects and funded over $2.0 billion of energy projects.  Vert seeks to be a single financing source for the mid-sized solar market.

CEN's Deck dated March 2019:

> Clean Energy Nexus is a complete financing solution for solar developers, EPCs, Solar Technology Providers and Project Hosts in the United States.  CEN's team has developed over 1,500 MWs of renewable energy projects and funded over $2.0 billion of energy projects.  CEN seeks to be a single financing source for the C&I solar market.

27.     In the Summary of Terms page of the CEN deck, Altenberg wrote that CEN was "a newly formed entity, former VERT Solar Finance for over 5 years."

28.     The same three individuals are identified in the respective decks as members of Debtor and CEN's Advisory Board (Rudy Garza, David Heitzer and Ankur Laroia).

29.      On a YouTube video about CEN, Altenberg said that CEN "provide[s] the capital, expertise and network to get solar projects done."  Altenberg described Debtor in the same way.

D.  <u>Altenberg Used CEN to Usurp Debtor's Interest in the Juncos Project</u>

30.     Altenberg and the Debtor were introduced to the Juncos Project by SRI Energy ("<u>SRI</u>").[5]  SRI is a solar energy developer based in Michigan and one of the many developers providing Altenberg and Debtor with information to complete PAR reports.

31.     SRI contacted Altenberg in early 2018, prior to the formation of CEN, and told Altenberg that it needed help from the Debtor responding to a Request for Proposal (RFP) issued by Medtronic to develop the Juncos Project.  SRI asked Altenberg if the Debtor would join its effort to pursue the Juncos Project, and provided the Debtor with a copy of the RFP which had been issued by Medtronic.

32.     Gonzales prepared a PAR (at the Debtor's expense and using the Debtor's software and other assets) for the Junco Project based on the information provided by SRI, and presented SRI with a copy of the PAR on the Debtor's letterhead.  It showed a high enough yield for the Juncos Project that Altenberg decided to join the project.

33.     In February 2019, Medtronic awarded the Juncos Project to SRI which contacted Altenberg to join the project.  By this time the Debtor was not paying its debts when due and had two lawsuits facing it. Also, Altenberg had formed CEN.  Rather than joining the Juncos Project in the Debtor's name as he had when preparing the PAR, Altenberg joined under his newly formed CEN.[6]  Altenberg did so to hide Juncos Project profits from Debtor's business and litigation creditors.

---

[5] Altenberg testified that CEN was working on a total of four solar projects with SRI Energy: the Juncos Project and three other projects located in Michigan.  Altenberg managed the construction of the Juncos Project.  Discovery will reveal the status of any other projects misappropriated by Altenberg.

[6] Altenberg delayed putting the Debtor into bankruptcy to determine the actual value of the assets he took from the Debtor and transfer to CEN, including the solar energy project in Puerto Rico.

34.     On February 20, 2019, CEN and SRI Energy entered into a Joint Development Agreement that included the acquisition, finance and/or sale of the Juncos Project.  Thereafter, CEN became actively involved in the Juncos Project and eventually assumed management of the development and construction process.  CEN outsourced construction to third parties, and hired Frank Bucceri of Bucceri Company to oversee construction.  Altenberg used the Debtor's form power purchase agreements and site leases for the Juncos Project.

35.     Altenberg has been paying himself a salary of $350,000 from CEN, plus "dividends."

36.     Altenberg subsequently formed CEN Juncos Solar LLC ("CEN Juncos"), a subsidiary of CEN, to hold the Juncos Project.  CEN Juncos was subsequently sold to Renewable Energy Alternatives ("REA"), a company based in Missouri, through a Membership Interest Purchase Agreement dated May 17, 2019.

E.   Altenberg Withholds Information About CEN

37.     On June 21, 2019, one week after Altenberg put Debtor into bankruptcy, Altenberg was deposed for the fourth time in the Delaware Action concerning CEN.  During the deposition, Altenberg, concerned about having just put the Debtor in bankruptcy after fraudulently transferring the Juncos Project to CEN, withheld information and refused to answer several key questions about CEN.  The information Altenberg wrongfully withheld during the deposition dealt with the assets and business opportunities he fraudulently transferred to CEN from Debtor.  (The Juncos Project turned out to be worth well over $1 million to CEN (which rightfully belongs to the Debtor)).  Altenberg's obstructive testimony highlighted Altenberg's desire to not disclose anything about the Juncos Project in Puerto Rico:

Q:     Where is the project located?

A:     In the United States.

**Q:     Specifically where?**

**A:     Specifically within the United States**.

Q:     Who is the client for that project?

[Instruction by counsel not to answer.  (The Delaware Court later told Altenberg's counsel that the instruction was improper.)]

Q:     What was the nature of that project?

A:     It's a solar project.

**Q:     Be more specific.  What type?  How big?**

**A:     I'm not answering that.**

Q:     So I'd like to know the description of the project.  Size –

A:     It's a ground mount solar project.

Q:     What about the size, kilowatt?

A:     It's in the megawatts.   It's greater than one megawatt, less than ten megawatts.

**Q:     You won't be more specific than that?**

**A:     No**.

Q:     Did Clean Energy Nexus [CEN] work with any other developers in connection with that project?

A:     Yes.

Q:     How many others?

A:     One other.

**Q:     And who was that codeveloper?**

12

> **A:     I'm not telling you.**

(emphasis added)

38.     Due to his refusal to provide the information, the Delaware Chancery Court subsequently issued an order compelling Altenberg to re-appear for a deposition and to provide the information he had refused to provide.  That order to compel resulted in Altenberg being re-deposed on August 7, 2019 where Altenberg was forced to be more forthcoming about CEN and the ever-more-clear highly successful Juncos Project that had been misappropriated from Debtor.

   F.   Altenberg's Wife is Gratuitously on Debtor's Payroll

39.     Altenberg paid his wife, Defendant Alison, who knew nothing about solar energy development or finance, as a part-time "office manager."  Altenberg paid Alison through Debtor's payroll company, Gusto, at an hourly rate of $36.06.  Alison was paid a bonus of $25,000, and received regular paychecks typically netting approximately $2,560 for each pay period she was paid.  Between June 15, 2017 and July 13, 2018, Alison was paid over $55,000 by the Debtor.  Alison remained on Debtor's payroll through at least October 2018.  During a deposition on October 26, 2017, Alison testified that her salary from Debtor at that time was $75,000 per year.

40.     During the October 26, 2017 deposition, Alison testified that she did not know what a "huddle" was and had never heard of it used in connection with Debtor's business despite the employees of the Debtor frequently engaging in a huddle to discuss business.  Alison admitted to not participating in any regularly schedule meetings while  allegedly "employed" by  the Debtor.  Alison also did not know the name of the system Debtor used for its information technology.

41.     Altenberg was asked about Alison's involvement with Debtor during his August 27, 2018 deposition.  Altenberg testified that his wife worked part-time as the Debtor's "office manager."  Altenberg did not have a good answer for why he was paying his wife for a part-time

job as an office manager more than a full-time project manager and full-time investment analyst. Altenberg also could not explain why two of Debtor's full-time employees failed to identify Alison as an employee of the Debtor when they were asked and why one of those employees said he saw Alison at the office once when she was bringing snacks into the office.  Alison did not have an email address from Debtor, did not have access to Debtor's computer network, and did not have a business card from Debtor.

    G.  <u>Debtor's Bankruptcy Filing</u>

    42.    On June 14, 2019, Debtor filed its voluntary petition for relief under Chapter 7 of the Bankruptcy Code (the "<u>Petition Date</u>").

    43.    Altenberg testified that Debtor filed bankruptcy because he hoped he could find a way to "save the business," but had failed.  Altenberg also admitted that a factor in Debtor filing bankruptcy was that "by September [2018] . . . the Teris situation was getting sort of flushed out." This meant that he knew before he formed CEN that the Teris Action was progressing toward the entry of a judgment against Debtor.

    44.    Altenberg also testified that by that same time, he figured out from the development work being done by Debtor that "[t]he market just doesn't know how to develop commercial solar projects."  The concept of pivoting from Debtor's broad work and focusing on the development process it had established "had always been a consideration."  As a result, Altenberg decided to take what he learned about the development process from the Debtor, funded by the VERT Fund Investors, and take it for his own benefit while stiffing the Debtor's creditors and investors.

    45.    On June 28, 2019, the Debtor filed its Summary of Assets and Liabilities for Non-Individuals ("<u>Schedules</u>") [Docket No. 4] and its Statement of Financial Affairs for Non-Individuals ("<u>Statements</u>") [Docket No. 5] (together, the "<u>Schedules and Statements</u>").  According to the Schedules and Statements, at the time of filing, the Debtor had $519,146.24 in assets ("<u>Total</u>

Assets") and $1,160,499.31 in liabilities ("Total Liabilities"). The Total Assets consist of one note receivable in the amount of $519,146.24, with the obligor on the note being Vert Solar Fund I LLC (subject to offset), intangibles and intellectual property in an unknown amount, and an investment interest in Vert Solar Fund I LLC with a 50% ownership interest after return of capital + 8%, valued at the time as $0.00.  *See* Docket No. 4, at p. 3-6.  The Total Liabilities include $8,175.00 in priority unsecured claims and $1,152,324.31 in nonpriority unsecured claims. *See id.* at p. 9-12. The Debtor did not list any secured creditors on its Schedules. *See id.* at p. 11.

46.     The Debtor's five (5) largest nonpriority unsecured creditors are as follows: Richards Layton & Finger ($341,479.53), VERT Solar Fund I, LLC ($230,428.99), Cosmich Simmons & Brown, PLLC ($165,200.74), Hinckley Allen ($102,165.61), and VERT Investment Group, LLC ($102,034.50).  These five creditors accounted for approximately 81% of the Debtor's Total Liabilities.

47.     In the meantime, Altenberg is making money through CEN.  Less than one month prior to the Petition Date, a payment of $500,707 was wired into CEN's Bank of America bank account by REA.  Altenberg was also collecting a salary from the Debtor of $350,000, plus distributions at his own discretion.

48.     The Juncos Project, now under the ownership of REA, is operational and in performance testing.  CEN remains involved in the project.

49.     By way of this Complaint, Plaintiff seeks all assets, including business interests and opportunities fraudulently transferred from Debtor to CEN including, but not limited to, all assets flowing from the Juncos Project to the Defendants or otherwise and all monies paid to Alison under the pretext of wages and salary (collectively the "Transfers").

125529343.6

**V.**

**CAUSES OF ACTION**

<u>**Count One - Avoidance of Actual Fraudulent Transfers –** *11 U.S.C. § 548(a)(1)(A)*</u>
**(versus Defendants Altenberg, CEN, and VIG)**

50.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

51.     Under Section 548(a)(1)(A) of the Bankruptcy Code, the Trustee may avoid any transfer of an interest of the debtor in property that was made within two years of the Petition Date with actual intent to hinder, delay, or defraud the Debtor's other creditors.

52.     During the nine-month period leading up to the Petition Date, Defendant Altenberg engaged in a scheme to defraud the Debtor and its creditors.  Beginning in September 2018, Altenberg covertly formed CEN, an entity that is identical to the Debtor, to avoid Debtor's business and litigation creditors after being asked to join the Juncos Project by SRI and preparing the PAR. In February 2019, Altenberg caused Debtor's interest in the Juncos Project, and potentially other solar energy projects, to be transferred to CEN.  Altenberg caused CEN, rather than Debtor, to enter a joint development agreement with SRI that would eventually net CEN over $1 million in profits.  The Debtor was insolvent at the time Altenberg transferred the Juncos Project to CEN, and the transfer effectively sealed Debtor's financial fate.

53.     By reason of the foregoing, the transfer of the Juncos Project, and any other solar energy project transferred from Debtor to CEN, are avoidable by the Trustee under Section 548 of the Bankruptcy Code.

54.     Accordingly, Defendants Altenberg, CEN, and VIG are the recipients of actual fraudulent transfers.

<u>**Count Two – Avoidance of Constructive Fraudulent Transfers -** *11 U.S.C. § 548(a)(1)(B)*</u>
**(versus Defendants Altenberg, CEN, and VIG)**

55.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

16

56.     Under Section 548(a)(1)(B) of the Bankruptcy Code, the Trustee may avoid any transfer of an interest of the debtor in property that was made within two years of the Petition Date in which the debtor received less than reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent on the date of the transfer or became insolvent as a result of said transfer.

57.     Four months prior to the Petition Date in February 2019, Defendant Altenberg caused Debtor's interest in the lucrative Juncos Project, and potentially other solar energy projects, to be transferred to CEN without compensation.  Altenberg caused CEN, rather than Debtor, to enter a joint development agreement with SRI that would eventually net CEN over $1 million in profits.  The Debtor was insolvent or was rendered insolvent when Altenberg transferred the lucrative Juncos Project to CEN.

58.     By reason of the foregoing, the transfer of the Juncos Project, and any other solar energy project transferred from Debtor to CEN, are avoidable by the Trustee under Section 548 of the Bankruptcy Code.

59.     Accordingly, Defendants Altenberg, CEN, and VIG are the recipients of constructive fraudulent transfers.

### Count Three - Avoidance of Constructive Fraudulent Transfers – *11 U.S.C. § 548(a)(1)(B)* (versus Defendants Altenberg and Alison)

60.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

61.     Under Section 548(a)(1)(B) of the Bankruptcy Code, the Trustee may avoid any transfer of an interest of the debtor in property that was made within two years of the Petition Date in which the debtor received less than reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent on the date of the transfer or became insolvent as a result of said transfer.

62.     During the two-year period leading up to the Petition Date, Defendant Altenberg caused the Debtor to pay his wife, Defendant Alison, an unreasonably high salary disproportionate to the services rendered to Debtor by Alison.  Alison received a salary of $75,000 from at least June 2017 through October 2018.  Alison was also given a $25,000 bonus despite evidence that she rarely, if ever was in the office performing work for the Debtor.  The Debtor did not receive a reasonably equivalent value in exchange for Alison's compensation, which contributed to the Debtor's insolvency as early as November 2017.

63.     By reason of the foregoing, these transfers are avoidable by the Trustee under section 548 of the Bankruptcy Code.

64.     Accordingly, Defendants Altenberg and Alison are the recipients of constructive fraudulent transfers.

### Count Four – Avoidance of Actual Fraudulent Transfers – *Tex. Bus. & Comm. Code § 24.005(a)(1) through 11 U.S.C. § 544(b)(1)* (versus Defendants Altenberg, CEN, and VIG)

65.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

66.     Under Section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid any transfer of an interest of the Debtor that is voidable under applicable state law by a creditor holding an unsecured allowable claim under 11 U.S.C. § 502.

67.     Under the Texas Fraudulent Transfer Act, a creditor may recover a transfer made with actual intent to hinder, delay, or defraud any creditor of the Debtor. TEX. BUS. & COMM. CODE § 24.005(a)(1).  Relevant factors for determining actual intent under Texas Act include: (1)  the transfer or obligation was concealed; (2) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (3) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the

obligation incurred; (4)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

68.     During the nine-month period leading up to the Petition Date, Defendant Altenberg engaged in a scheme to defraud the Debtor and its creditors.  Beginning in September 2018, Altenberg covertly formed CEN, an entity that is identical to the Debtor, to avoid Debtor's business and litigation creditors after being asked to join the Juncos Project by SRI and preparing the PAR. In February 2019, Altenberg caused Debtor's interest in the Juncos Project, and potentially other solar energy projects, to be transferred to CEN.  Altenberg caused CEN, rather than Debtor, to enter a joint development agreement with SRI that would eventually net CEN over $1 million in profits.  The Debtor was insolvent at the time Altenberg transferred the Juncos Project to CEN, and the transfer effectively sealed Debtor's financial fate.

69.     By reason of the foregoing, the transfer of the Juncos Project, and any other solar energy project transferred from Debtor to CEN, are avoidable by the Trustee under the Texas Fraudulent Transfer Act.

70.     Accordingly, the Trustee is entitled to recover all of the transfers that were wrongly transferred to Defendants Altenberg, CEN, and VIG.

### Count Five – Avoidance of Constructive Fraudulent Conveyances – <br> TEX. BUS. & COMM. CODE § 24.005(a)(2) through 11 U.S.C. § 544(b)(1) <br> (versus Defendants Altenberg, CEN, and VIG)

71.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

72.     Under Section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid any transfer of an interest of the Debtor that is voidable under applicable state law by a creditor holding an unsecured allowable claim under 11 U.S.C. § 502.  At the time of the Transfers, other creditors of the Debtor held unsecured claims allowable under 11 U.S.C. § 502.

19

73.     Under the Texas Fraudulent Transfer Act a creditor may recover a transfer made without receiving a reasonably equivalent value in exchange for the transfer and the debtor was engaged in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the transaction.  TEX. BUS. & COMM. CODE § 24.005(a)(2)(A).

74.     Four months prior to the Petition Date in February 2019, Defendant Altenberg caused Debtor's interest in the Juncos Project, and potentially other solar energy projects, to be transferred to CEN without compensation.  Altenberg caused CEN, rather than Debtor, to enter a joint development agreement with SRI that would eventually net CEN over $1 million in profits. The Debtor was insolvent or was rendered insolvent when Altenberg transferred the Juncos Project to CEN.

75.     By reason of the foregoing, the transfer of the Juncos Project, and any other solar energy project transferred from Debtor to CEN, are avoidable by the Trustee under the Texas Fraudulent Transfer Act.

76.      Accordingly, the Trustee is entitled to recover these transfers which were wrongly transferred to Defendants Altenberg, CEN, and VIG.

**Count Six – Avoidance of Constructive Fraudulent Conveyances –
_TEX. BUS. & COMM. CODE § 24.005(a)(2) through 11 U.S.C. § 544(b)(1)_
(versus Defendants Altenberg and Alison)**

77.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

78.     Under Section 544(b)(1) of the Bankruptcy Code, the Trustee may avoid any transfer of an interest of the Debtor that is voidable under applicable state law by a creditor holding an unsecured allowable claim under 11 U.S.C. § 502.  At the time of the transfers, other creditors of the Debtor held unsecured claims allowable under 11 U.S.C. § 502.

79.    Under the Texas Fraudulent Transfer Act a creditor may recover a transfer made without receiving a reasonably equivalent value in exchange for the transfer and the debtor was engaged in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the transaction.  TEX. BUS. & COMM. CODE § 24.005(a)(2)(A).

80.    During the two-year period leading up to the Petition Date, Defendant Altenberg caused the Debtor to pay his wife, Defendant Alison, an unreasonably high salary disproportionate to the services rendered to Debtor by Alison.  Alison received a salary of $75,000 from at least June 2017 through October 2018.  Alison was also given a $25,000 bonus despite evidence that she rarely, if ever was in the office performing work for the Debtor.  The Debtor did not receive a reasonably equivalent value in exchange for Alison's compensation, which contributed to the Debtor's insolvency as early as November 2017.

81.    By reason of the foregoing, these transfers are avoidable by the Trustee under the Texas Fraudulent Transfer Act.

82.    Accordingly, the Trustee is entitled to recover these transfers which were wrongly transferred to Defendants Altenberg and Alison.

**Count Seven – Recovery of Fraudulent Transfers – *11 U.S.C. § 550(a)***
**(versus Defendants Altenberg, CEN, VIG, and Alison)**

83.    The Trustee incorporates all preceding paragraphs as if fully set forth herein.

84.    Under Section 550(a) of the Bankruptcy Code, to the extent that a transfer is avoided under 11 U.S.C. §§ 544 and 548, *inter alia*, the Trustee can recover the payments or value of the payments from the "initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transfer."

85.    The Defendants are the initial transferees or the immediate or mediate transferees of the initial transferees of the avoided transfers pursuant to Counts One through Six.

86.     By reason of the foregoing, the Trustee is entitled to recover the transfers wrongfully made to the Defendants and each of them under section 550(a) of the Bankruptcy Code for the benefit of the Debtor's estate and creditors.

87.     The Trustee further requests that a Court enter a judgment awarding the Trustee pre- and post- judgment interest for the transfers.

### Count Eight – Breach of Fiduciary Duty
**(versus Defendant Altenberg)**

88.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

89.     Altenberg owed Debtor the fiduciary duties of care and loyalty as the chief executive officer and managing member of Debtor.

90.     By engaging in the fraud alleged herein including, but not limited to, the misappropriation and fraudulent transfer of the Juncos Project, the usurpation of other business interests of the Debtor, and paying Alison a salary for a job she did not perform, Altenberg breached his fiduciary duties.

91.     Altenberg's breach of the duty of loyalty is centered on his self-interested and self-dealing transactions that were not entirely fair to the Debtor.

92.     Debtor was substantially damaged as a result of Altenberg's breach of fiduciary duty of care and loyalty.

### Count Nine – Knowing Participation Conspiracy to Breach Fiduciary Duties
**(versus Defendants CEN, VIG, and Alison)**

93.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

94.     To establish a claim under Texas law for knowing participation in the breach of a fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the defendant third party knew of the fiduciary relationship; and (3) that the defendant third party was

22

aware that it was participating in breach of that fiduciary duty.  *Meadows v. Harford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007).

95.     Altenberg owed Debtor the fiduciary duties of care and loyalty as the chief executive officer and managing member of Debtor.

96.     Defendants CEN, VIG, and Alison at all material times hereto knew that Altenberg owed fiduciary duties of care and loyalty to the Debtor.

97.     Defendants CEN, VIG, and Alison knowingly participated and furthered Altenberg's breach of fiduciary duties owed to Debtor.

98.     Debtor was substantially damaged as a result of CEN, VIG, and Alison's knowing participation in Altenberg's breach of fiduciary duty of care and loyalty to the Debtor.

**Count Ten – Unjust Enrichment**
**(versus Defendants)**

99.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

100.     Based on principles of justice, equity, and good conscience, the Defendants have been unjustly enriched by the Transfers.  The Transfers caused the Defendants to receive money or other interests that belonged to the Debtor (for the benefit of its creditors) for less than reasonably equivalent value.

101.     The Transfers involved actual fraud and malice on the part of Altenberg.

102.     By reason of the foregoing, the Transfers should be disgorged and paid to the Trustee to enable the Trustee to fulfil her duties to the bankruptcy estate and satisfy her obligations to the Debtor's creditors.

**Count Eleven – Attorney's Fees**
**(versus Defendants)**

103.     The Trustee incorporates all preceding paragraphs as if fully set forth herein.

104.    Under the Texas Fraudulent Transfer Act, the Court "may award costs and reasonable attorney's fees as are equitable and just." *See* TEX. BUS. COMM. CODE § 24.013.

105.    By reason of the foregoing, the Trustee is entitled to recover her costs and reasonable attorney's fees in her claims against the Defendants.

### Count Twelve – Pre- and Post-Judgment Interest
### (versus Defendants)

106.    The Trustee incorporates all preceding paragraphs as if fully set forth herein.

107.    The Trustee seeks pre-judgment interest on the value of the Transfers through the date of judgment.   The Trustee seeks post-judgment interest on all money damages awarded hereunder from the date of judgment until paid at the prevailing federal judgment rate.

## **PRAYER**

**WHEREFORE, PREMISES CONSIDERED,** the Trustee, Eva S. Engelhart, respectfully prays that this Court:

(a)     Enter judgment in the Trustee's favor on all causes of action asserted in this Complaint;

(b)     For a determination that the Transfers are avoided as actual and constructive fraudulent transfers under Section 548 of the Bankruptcy Code;

(c)     For a determination that the Transfers are avoided as actual and constructive fraudulent transfers under Sections 24.005(a)(1) and 24.005(a)(2) of the Texas Business and Commerce Code through section 544(b)(1) of the Bankruptcy Code;

(d)     For a determination that the Trustee is entitled to recover the Transfers under Section 550 of the Bankruptcy Code;

(e)     For a determination that Altenberg breached his fiduciary duties to Debtor;

(f)     For a determination that CEN, VIG, and Alison knowingly participated in Altenberg's breach of fiduciary duty;

(g)     For a determination that the Debtor is entitled to damages for Altenberg's breach of fiduciary duty and CEN, VIG, and Alison's knowing participation;

(h)     For a determination that the Defendants have been unjustly enriched by payment of the Transfers and that the Transfers should thus be disgorged to the Bankruptcy Estate;

(i)     For the award of the costs of the suit incurred herein, including attorney's fees pursuant to Section 24.013 of the Texas Business and Commerce Code;

(j)     For pre- and post-judgment interest on the judgment amount to the fullest extent allowed by applicable law; and

125529343.6

(k)     For such other and further relief as the Court may deem just and proper.

Dated:        Houston, Texas
              August 26, 2021

                                Respectfully submitted,

                                **FOX ROTHSCHILD LLP**

                                */s/ Trey A. Monsour*               
                                Trey A. Monsour, Esq. (Tex. Bar No. 14277200)
                                Fox Rothschild LLP
                                Saint Ann Court
                                2501 North Harwood Street, Suite 1800
                                Dallas, TX  75201
                                Tel:  (214) 231-5796
                                Fax:  (972) 404-0516
                                2900 West Dallas Street #515
                                Houston, TX 75219
                                Cell:  (713) 927-7469
                                E-mail: tmonsour@foxrothschild.com

                                -and-

                                Sidney S. Liebesman (admitted *pro hac vice*)
                                919 N. Market Street, Suite 300
                                Wilmington, DE  19801
                                Telephone: (302) 654-7444
                                E-mail: sliebesman@foxrothschild.com

                                *Special Counsel to Eva S. Engelhart, Chapter 7*
                                *Trustee*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 26, 2021, a true and correct copy of the above and foregoing *Trustee's Amended Original Complaint* was served electronically on all parties registered to receive electronic notice of filings in the case via the Court's ECF notification system (including counsel for the defendants) noted below.

> H. Miles Cohn
> Crain, Caton & James, PC
> 1401 McKinney, 17th Floor
> Houston, TX 77010
> mcohn@craincaton.com
> *Counsel for Defendants Joaquin Altenberg, Clean Energy Nexus, LLC, VERT Investment Group, LLC, and Alison Altenberg*

> */s/ Trey A. Monsour*
> Trey A. Monsour

125529343.6